**GUCOVSCHI ROZENSHTEYN, PLLC.**
Adrian Gucovschi (State Bar No. 360988)
Nathaneil Haim Sair*
140 Broadway, Fl. 46
New York, NY 10005
Telephone: (212) 884-4230
Facsimile: (212) 884-4230
E-Mail: adrian@gr-firm.com
         nsari@gr-firm.com

**BURSOR & FISHER, P.A.**
Alec M. Leslie*
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7126
Facsimile: (212) 989-9163
Email: aleslie@bursor.com

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM TERRILL, individually and on behalf of all others similarly situated,<br><br>            Plaintiff,<br><br>    v.<br><br>DIALPAD, INC.,<br><br>            Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff William Terrill ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Dialpad, Inc. ("Defendant" or "Dialpad"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

**NATURE OF THE ACTION**

1. Dialpad developed and operates a conversation intelligence software-as-a-service ("SaaS") that it sells to, and partners with, third-party businesses (such as T-Mobile) so that those businesses can "elevate every conversation, all from one Ai-powered customer communications platform."[1] To accomplish this, Defendant uses its proprietary technology, including DialpadGPT, an AI model trained on over 10 billion minutes of business conversations to analyze voice interactions between businesses and consumers.[2] The platform operates by recording a caller's speech and then transcribing it using natural language processing ("NLP"), allowing artificial intelligence ("AI") to read the text, identify patterns, and classify the data. The result is that T-Mobile consumers' telephone conversations are surreptitiously transmitted to Dialpad's servers, where it is processed and analyzed using Dialpad's AI and NLP, and thereafter presented to Dialpad's clients in dashboards, searchable transcripts, and reports.

2. Dialpad's conversation intelligence SaaS includes several services ("Services"), including, *inter alia*, live transcriptions; keyword tracking; sentiment analysis; and AI CSAT. Third party businesses such as T-Mobile employ Defendant's Services.

3. By employing the Services, T-Mobile has aided, agreed with, employed, and/or permitted Dialpad to monitor, read, record, learn the contents of, or otherwise intercept the conversations of their current and prospective consumers without their consent. These consumers include individuals who call T-Mobile (*i.e.*, their customer service line) from within the State of

---

[1] https://www.dialpad.com/ai-contact-center/

[2] https://www.businesswire.com/news/home/20250430445178/en/Dialpad-Now-Available-on-Google-Cloud-Marketplace-Bringing-Ai-Powered-Customer-Communication-to-Millions-of-Google-Cloud-Customers

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                                                 1

1  California to, among other things, retrieve information, schedule service appointments, make
2  changes to subscriptions, and receive additional forms of customer support.

3     4. Unbeknownst to consumers, when they contact and speak with businesses such as T-
4  Mobile, Dialpad eavesdrops and records these conversations to which it is not a party. By partnering
5  with third party businesses and deploying its Services, Dialpad collects a trove of data from telephone
6  conversations between businesses (in this case, T-Mobile) and their consumers.

7     5. Dialpad needs access to this data to provide the Services' features (including, *inter
8  alia*, call recording, call transcription, and analysis thereof) described *infra*. Thus, Dialpad records,
9  accesses, reads, and learns the contents of conversations between California residents, on the one
10 hand, and businesses, including but not limited to T-Mobile, on the other hand.

11    6. Crucially, neither T-Mobile nor Dialpad procured the consent of any person who
12 interacted with T-Mobile prior to Dialpad recording, accessing, reading, and learning the contents of
13 conversations between Californian residents and T-Mobile.

14    7. For instance, T-Mobile consumers are told: "we care about your experience, so, we
15 may record this call." However, there is no disclosure that consumers' calls will also be shared with
16 Dialpad, an unknown third party, for purposes unrelated to quality assurance and/or training. This
17 lack of consent is particularly troublesome given that Dialpad has the capability to use the contents
18 of those conversations for purposes other than simply relaying the same to T-Mobile.

19    8. Plaintiff brings this action to prevent Defendant from further violating the privacy
20 rights of California residents, and to recover statutory damages from Defendant for failing to comply
21 with the California Invasion of Privacy Act ("CIPA") §§ 631 and 632.

22              **PARTIES**

23    9. Plaintiff William Terrill resides in Cathedral City, California, intends to remain there,
24 and is, therefore, a citizen of California. Mr. Terrill was in California when he called T-Mobile in
25 or around March of 2025. Mr. Terrill reasonably expected that his conversation with T-Mobile was
26 only between himself and T-Mobile. Mr. Terrill was not aware, nor did he have any reason to
27 suspect, that his phone call was being surreptitiously transmitted to an unknown third party software
28 analytics provider: Dialpad.

10. Nonetheless, Dialpad, through the Services, eavesdropped on Mr. Terrill's entire conversation with T-Mobile. Specifically, Dialpad, through the Services, recorded and transcribed Mr. Terrill's conversation in real time and performed AI analysis thereon. Through this process, Dialpad read, learned, and used the contents of Mr. Terrill's conversation with T-Mobile in real time. Both Dialpad and T-Mobile failed to inform Mr. Terrill, prior to recording: (i) that a third party, Dialpad, was listening in on his communications with T-Mobile, (ii) that a third party, Dialpad, was tapping or otherwise making an unauthorized connection with Mr. Terrill's telephone conversation using the Services, and (iii) that the contents of Mr. Terrill's confidential communications with T-Mobile were being recorded, collected, intercepted, and analyzed by a third party, Dialpad, using the Services.

11. Nor did Mr. Terrill provide consent for the contents of his communications to be used for purposes other than T-Mobile's internal training or quality assurance purposes, such as Dialpad's marketing analytics, AI development, and industry reports, amongst other uses, as discussed *infra*. Therefore, Mr. Terrill did not consent to Dialpad intercepting or recording his calls to T-Mobile, nor did he consent to the contents of his communication to be used by T-Mobile or Dialpad for the full scope of the Services or Dialpad's other uses of the call recordings.

12. Plaintiff has, accordingly, had his privacy invaded due to Dialpad's violations of CIPA alleged herein.

13. Defendant Dialpad, Inc. is a Delaware corporation with its principal place of business in San Ramon, California.

**JURISDICTION AND VENUE**

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action where there are more than 100 members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one member of the putative Class is a citizen of a state different from Defendant.

15. The Court has personal jurisdiction over Defendant because Defendant is headquartered in this District.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### I. The California Invasion Of Privacy Act

17. The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens. The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

18. The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

19. Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

20. As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any … communication while the same is in transit or passing over any wire, line, or cable, or is being sent

from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use … any information so obtained."

21. CIPA § 631(a) also penalizes [iv] those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

22. As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

23. Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation. Cal. Penal Code § 637.2(a)(1). Plaintiff does so here against Dialpad.

## II. Defendant Violates The California Invasion Of Privacy Act

24. Dialpad is a leader in AI conversation analytics. To accomplish this, Defendant uses it proprietary technology, DialpadGPT—an AI model trained on "billions of conversations and transcripts to provide unmatched precision in the context of business interactions."[3] Dialpad's conversation intelligence software-as-a-service ("SaaS") includes several services such as: live transcriptions; keyword tracking; sentiment analysis; and AI CSAT (the "Services").

25. Dialpad's live transcriptions generate real-time call transcripts during active conversations.[4] This feature allows supervisors to "scan transcripts instead of listening to each call."[5]

26. Dialpad's keyword tracking "highlight[s] every time a certain word or phrase is mentioned" which permits companies to upgrade their "FAQs, or identify a high volume of complaints about a particular product."[6] Dialpad labels these insights "speech analytics," which it describes as "the process of [] analyzing and extracting data and insights from conversations that

---

[3] https://www.dialpad.com/ai-labs/dialpad-gpt/
[4] https://www.dialpad.com/features/ai-transcription/
[5] https://www.dialpad.com/features/conversation-intelligence/
[6] https://www.dialpad.com/features/contact-center-ai/

your business has—usually on the phone, and usually with customers and prospects."[7] This feature, enables Dialpad's clients to "track how often terms like 'money back' or 'cancel' or 'refund' comes up on customer conversations" so they can "anticipate issues better and solve issues before customers leave."[8] Dialpad's AI also automatically "analyze[s] phone calls and messaging conversations to identify keywords that come up regularly."[9]

27. Sentiment analysis is a "feature that uses Ai to analyze phone calls and customer conversations for words that suggest positive or negative sentiment."[10] This tool enables businesses to obtain "trend reports, agent performance insights, and even automated alerts for potential customer dissatisfaction, which allow them to intervene proactively."[11] Dialpad proudly touts that its AI "has analyzed over eight billion minutes of business conversations, making it highly accurate in its analysis of calls with customers—which also means it can reliably discern whether customers are frustrated, happy, and so on."[12]

28. Finally, AI CSAT predicts customer satisfaction scores by analyzing resolution outcomes and speech patterns (*e.g.*, prolonged pauses, frustration) by using Dialpad's AI.[13] AI CSAT's feature has achieved 87% correlation to post-call surveys, thus eliminating the need for post-call customer satisfaction surveys.[14] Dialpad achieves this by using a call " transcript [which] is fed into a deep neural network that makes accurate predictions by updating its ~100 million parameters based on the 1.3 million anonymized calls used for training."[15]

29. Dialpad agglomerates the data from these features into its "Contact Center AI" which permits business to "process incoming conversation data to not only accurately capture the words

---

[7] https://www.dialpad.com/features/speech-analytics-software/
[8] *Id.*
[9] https://www.dialpad.com/blog/voice-analytics/
[10] https://www.dialpad.com/features/contact-center-sentiment-analysis/
[11] *Id.*
[12] *Id.*
[13] https://help.dialpad.com/docs/ai-csat-customer-satisfaction
[14] *Id.*
[15] *Id.*

but also determine the sentiment behind them…. mean[ing] call center supervisors can keep an eye on active calls and jump in to help if needed."[16]

30. When Dialpad uses the Services on a phone conversation, it is not like a tape recorder or a "tool" used by one party to record the other. Instead, Dialpad—a separate and distinct third-party entity from the parties to the conversation—uses the Services to eavesdrop upon, record, extract data from, and analyze a conversation to which it is not a party. This is because Dialpad itself is collecting the content of any conversation. That data is then analyzed by Dialpad in the manner alleged above before being provided to any entity that was a party to the conversation (like T-Mobile).

31. Dialpad has the capability to use the contents of conversations it collects through Services for its own purposes and purposes beyond simply furnishing recordings to its clients, such as T-Mobile.

32. Indeed, Dialpad can perform a comprehensive analysis on the calls it eavesdrops upon, including identifying the category of the speaker and ascertaining the intent of the call. As Dialpad repeatedly explains, its proprietary AI "DialpadGPT" is built on "over seven billion minutes of conversational data."[17]

33. Further, in its "Privacy" policy, Dialpad explains that it "may also temporarily process Personal Data"—which includes contact lists, call records, recordings, and transcripts—"for purposes such as technical support, customer support, and sales" and that, by default, "data associated with calls is processed through Dialpad's Data Centers and may be stored there for no more than 72 hours."[18]

34. Similarly, Dialpad states in its Privacy Policy that it uses "Personal Data"—which includes Location, Identifying Information, Device and Session Information, Telephony, Session Audio, Video, and Messaging, Communication—to "Improve the Services. Such as A/B testing of

---

[16] https://www.dialpad.com/features/contact-center-ai/
[17] https://www.dialpad.com/dialpad-ai/
[18] https://www.dialpad.com/legal/#privacy

new features, improvement of AI speech recognition and language processing, and performance monitoring."[19]

35. Indeed, the Privacy Policy explicitly states:

> "Dialpad's Ai features are uniquely useful because they are based on real business conversations by real Dialpad users. By allowing Dialpad Ai to learn from your conversations, such as segments of call audio, video, transcriptions, and messaging, you can help us improve communication through enhanced call quality, more accurate transcriptions, and real-time insights."[20]

36. Although the policy states that sharing such information is "not necessary," elsewhere, Dialpad states that it may send "anonymized samples of audio or text to a third party to improve speech-to-text transcription and reading comprehension."[21] Furthermore, Dialpad also states in its Privacy Policy that it reserves the right to "[u]se or disclose De-identified Personal Data in our sole discretion."[22]

37. In fact, Dialpad's Terms of Service unequivocally states that if businesses use "Dialpad features that include collection of audio or transcript data" which is "is included in the definition of Customer Data" those businesses:

> "grant to Dialpad a perpetual, worldwide, royalty-free, fully paid-up, non-exclusive license to copy, store, record, transmit, display, view, print, and use Customer Data to the extent necessary to provide, develop, and improve the Services. You agree that we may authorize access to Customer Data and share how you use our Services to employees, contractors, and agents who need to know the information in order to improve, personalize, and provide Services, conduct research for product development, and enhance user experience."[23]

38. Thus, Dialpad has the capability to use the wiretapped data it collects through the Services to, *inter alia*, provide, run, personalize, improve, operate, maintain, and market its products and services, and to conduct performance reporting.

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] https://www.dialpad.com/legal/#terms-of-service

39. Dialpad knows that consumers of T-Mobile are unaware that Dialpad is monitoring, recording, and/or analyzing their conversations. Nonetheless, Dialpad violates consumers' privacy rights, without the requisite consent, in pursuit of profit.

## CLASS ALLEGATIONS

40. Plaintiff seeks certification of the following class: all California residents who called T-Mobile while in California and whose conversations were intercepted and recorded by Dialpad (the "Class").

41. Plaintiff reserves the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

42. The following people are excluded from the Class: (1) any Judge presiding over this action and members of her or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

43. **Numerosity:** The number of persons within the Class is substantial and believed to amount to thousands, if not millions of persons. It is, therefore, impractical to join each member of the Class as a named Plaintiff. Further, the size and relatively modest value of the claims of the individual members of the Class render joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, the Class is ascertainable and identifiable from Defendant's records.

44. **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the

individual circumstances of any Class member, include, but are not limited to, the following: whether Defendant violated CIPA §§ 631 and 632; whether Defendant sought or obtained prior consent—express or otherwise—from Plaintiff and the Class; and whether Plaintiff and members of the Class are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

45.     **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other members of the Class members, called T-Mobile's telephone lines and had the content of their communications read, learned, analyzed, and/or examined by Dialpad.

46.     **Adequate Representation:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of members of the Class will be fairly and adequately protected by Plaintiff and his counsel.

47.     **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Class. Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

# CAUSES OF ACTION

### COUNT I
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 631(a)

48. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

49. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

50. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).

51. To establish liability under CIPA § 631(a), a plaintiff need only establish that a defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

> *Or*

> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

> *Or*

> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

> *Or*

> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

52. The Services are a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

53. Dialpad is a separate legal entity from T-Mobile that offers "'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Accordingly, Dialpad was a third party to any communication between Plaintiff and members of the Class, on the one hand, and T-Mobile, on the other. *Id.* at 521; *see also Flowers v. Twilio, Inc.*, 2016 WL 11684603, at *1 (Cal. Super. Ct. Aug. 2, 2016) ("[T]he complaint makes clear that it is Twilio, not its clients, that recorded the communications … The allegations are not, as Twilio asserts, that Twilio simply provided a software product that third parties misused.").

54. Dialpad is a third party wiretapper because it has the capability to use the contents of conversations it collects through the Services for its own purposes, other than simply furnishing the recording to its clients, such as T-Mobile. *Javier v. Assurance IQ, LLC*, 2649 F. Supp. 3d 891, 900 (N.D. Cal. 2023); *see also Yockey v. Salesforce, Inc.*, --- F. Supp. 3d ---, 2023 WL 5519323, at *5 (N.D. Cal. Aug. 25, 2023).

55. At all relevant times, through the Services, Dialpad violated the first prong of CIPA § 631(a) by intentionally tapping, electrically or otherwise, the lines of telephone communication between Plaintiff and Class Members, on the one hand, and T-Mobile, on the other hand.

56. At all relevant times, through the Services, Dialpad violated the second prong of CIPA § 631(a) by willfully and without the consent of all parties to the communication, or in any unauthorized manner, reading or attempting to read or learn the contents of electronic communications between Plaintiff and Class Members, on the one hand, and T-Mobile, on the other hand, while the electronic communications were in transit or passing over any wire, line or cable or were being sent from or received at any place within California.

57. Dialpad failed to inform Plaintiff and Class Members: (i) that Dialpad, as a third party, was listening in on communications between Plaintiff and Class Members, on the one hand, and T-Mobile, on the other hand; (ii) that Dialpad, as a third party, was tapping or otherwise making an unauthorized connection with Plaintiff's and Class Members' conversations with T-Mobile using the

Services; and (iii) that the content of Plaintiff's and Class Members' communications with T-Mobile were being recorded, collected, intercepted, and analyzed by, Dialpad, a third party.

58. Accordingly, neither Plaintiff nor any Class Member consented to Dialpad's interception of their communications with T-Mobile.

59. Dialpad knows it is a separate and distinct third-party entity from T-Mobile and customer service agents, the consumers speaking with T-Mobile, and the conversations at issue. Dialpad knows it is eavesdropping upon and recording conversations to which it is not a party.

60. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by the violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Dialpad's violations of CIPA § 631(a).

## COUNT II
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 632(a)

61. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

62. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

63. CIPA § 632(a) prohibits an entity from "intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio." Cal. Penal Code § 632(a).

64. The Services are an "electronic amplifying or recording device."

65. At all relevant times, Dialpad intentionally recorded the confidential communications of Plaintiff and Class Members.

66. At all relevant times, the communications between Plaintiff and the Class Members, on the one hand, and T-Mobile, on the other, were confidential. Communications entail discussions

of financial information for payment processing, and other forms of information required for the purpose of identity verification.

67. When communicating with T-Mobile, Plaintiff and Class Members had an objectively reasonable expectation of privacy. Plaintiff and the Class Members did not expect that Dialpad, an unknown third party, would intentionally use an electronic amplifying or recording device to record their confidential communications.

68. Plaintiff and the Class Members did not consent to Dialpad's intentional use of an electronic amplifying or recording device to record their confidential communications.

69. Pursuant to Cal. Penal Code § 637.2, Plaintiff and the Class Members have been injured by the violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Dialpad's violations of CIPA § 632(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b) For an order declaring that Defendant's conduct violates the statute referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) For actual, compensatory, statutory, and/or punitive in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For an order of restitution and all other forms of equitable monetary relief;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: May 28, 2025                    Respectfully submitted,

**GUCOVSCHI ROZENSHTEYN, PLLC.**

By:   /s/ Adrian Gucovschi

Adrian Gucovschi (State Bar No. 360988)
Nathaniel Haim Sari*
140 Broadway, Fl. 46
New York, NY 10005
Telephone: (212) 884-4230
Facsimile: (212) 884-4230
E-Mail: adrian@gr-firm.com

**BURSOR & FISHER, P.A.**
Alec M. Leslie*
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7126
Facsimile: (212) 989-9163
Email: aleslie@bursor.com

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff*