KEKER, VAN NEST & PETERS LLP
BENJAMIN BERKOWITZ - # 244441
bberkowitz@keker.com
CHRISTINA LEE - # 314339
clee@keker.com
IAN KANIG - # 295623
ikanig@keker.com
SPENCER MCMANUS - # 322824
smcmanus@keker.com
LAUREN S. KANE - # 329375
lkane@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

Attorneys for Defendant DIALPAD, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WILLIAM TERRILL, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DIALPAD, INC.,<br><br>Defendant. | Case No. 3:25-cv-04509-JD<br><br>**DEFENDANT DIALPAD INC.'S NOTICE OF MOTION AND MOTION TO COMPEL INDIVIDUAL ARBITRATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>**Pursuant to Fed. Arb. Act, 9 U.S.C. §§ 3, 4.**<br><br>Date: November 13, 2025<br>Time: 10:00 a.m.<br>Dept.: 11—19th Floor<br>Judge: Hon. James Donato<br><br>Date Filed: May 28, 2025<br>Trial Date: None Set |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ....... 1

II. BACKGROUND ....... 3

A. Plaintiff has repeatedly agreed to individually arbitrate claims he has against T-Mobile and related third parties since opening an account in June 2016. ....... 3

B. T-Mobile's individual arbitration agreement covers any claims related to its incorporated Privacy Notice, privacy practices, services, devices, or products. ....... 5

C. T-Mobile's Privacy Notice discloses that T-Mobile may share customer service calls with third-party service providers for any business purpose. ....... 6

D. Plaintiff now alleges that T-Mobile secretly partnered with Dialpad to analyze his customer service call, but asserts privacy claims against Dialpad alone. ....... 7

III. ARGUMENT ....... 8

A. Plaintiff's privacy claims against Dialpad fall squarely within the scope of the valid individual arbitration agreement that he entered into with T-Mobile. ....... 8

B. Dialpad is entitled to enforce Plaintiff's arbitration agreement with T-Mobile as a nonsignatory under California's doctrine of equitable estoppel. ....... 9

1. Plaintiff's claims are intertwined with his contract with T-Mobile because they require interpretation of T-Mobile's Privacy Notice. ....... 10

2. Plaintiff's allegations that T-Mobile and Dialpad acted in concert to invade his privacy are also intertwined with T-Mobile's disclosures ....... 13

C. This Court should stay Plaintiff's action pending resolution of arbitration ....... 15

IV. CONCLUSION ....... 15

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases


*Bender v. Twilio Inc.*,
2025 WL 2308484 (N.D. Cal. Aug. 11, 2025) ........ *passim*

*Breathe Techs., Inc. v. New Aera, Inc.*,
2020 WL 4747896 (N.D. Cal. Aug. 17, 2020) ........ 13

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021) ........ 11

*Carter v. Spiegel*,
2022 WL 126303 (N.D. Cal. Jan. 13, 2022) ........ 14

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
207 F.3d 1126 (9th Cir. 2000) ........ 9

*Clements v. T-Mobile USA, Inc.*,
712 F. Supp. 3d 1290 (N.D. Cal. 2024) ........ 9

*Coinmint, LLC v. DX Corr Design, Inc.*,
2023 WL 9595893 (N.D. Cal. Apr. 24, 2023) ........ 15

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985) ........ 8

*Dominguez v. T-Mobile USA, Inc.*,
2017 WL 8220598 (C.D. Cal. Jan. 18, 2017) ........ 9

*Franklin v. Cmty. Reg'l. Med. Ctr.*,
998 F.3d 867 (9th Cir. 2021) ........ 2, 10

*Herrera v. Cathay Pac. Airways Ltd.*,
104 F. 4th 702 (9th Cir. 2024) ........ 2, 3, 9, 10

*Hunt v. Meta Platforms, Inc.*,
735 F. Supp. 3d 1133 (N.D. Cal. 2024) ........ 2, 10, 13, 15

*Juarez v. T-Mobile USA Inc.*,
2024 WL 5424366 (C.D. Cal. Aug. 23, 2024) ........ 9

*Kilgore v. KeyBank, Nat'l Ass'n*,
718 F.3d 1052 (9th Cir. 2013) ........ 8

*Marmet Health Care Ctr., Inc. v. Brown*,
565 U.S. 530 (2012) ........ 8

*In re Pac. Fertility Ctr. Litig.*,
814 F. App'x 206 (9th Cir. 2020) ....................10

*Perry-Hudson v. Twilio, Inc.*,
2024 WL 4933332 (N.D. Cal. Dec. 2, 2024) .................... *passim*

*Rodriguez v. T-Mobile USA, Inc.*,
2023 WL 6593786 (S.D. Cal. Sept. 28, 2023) ....................9

*S.S. by & through Stern v. Peloton Interactive, Inc.*,
566 F. Supp. 3d 1019 (S.D. Cal. 2021) ....................8

*Salas v. Universal Credit Servs., LLC*,
2019 WL 1242448 (S.D. Cal. Mar. 18, 2019) ....................15

*Sanders v. Swift Transp. Co. of Ariz., LLC*,
843 F. Supp. 2d 1033 (N.D. Cal. 2012) ....................13, 14

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017) ....................11

*Smith v. Spizzirri*,
601 U.S. 472 (2024) ....................v, 15

*Theodore v. Am. Express Nat'l Bank*,
2024 WL 4165274 (N.D. Cal. Aug. 27, 2024) ....................15

*Thomasson v. GC Servs. Ltd. P'ship*,
321 F. App'x 557 (9th Cir. 2008) ....................11

*Uptown Drug Co., Inc. v. CVS Caremark Corp.*,
962 F. Supp. 2d 1172 (N.D. Cal. 2013) ....................13

*Williams v. Eaze Sols., Inc.*,
417 F. Supp. 3d 1233 (N.D. Cal. 2019) ....................8

**<u>State Cases</u>**

*Flanagan v. Flanagan*,
27 Cal. 4th 766 (2002) ....................11

**<u>Federal Statutes</u>**

9 U.S.C. § 1 ....................8

9 U.S.C. § 3 ....................v, 15

9 U.S.C. § 4 ....................v

**State Statutes**

Cal. Penal Code § 631(a) ....................11

Cal. Penal Code § 632 ....................11

**NOTICE OF MOTION AND MOTION TO COMPEL INDIVIDUAL ARBITRATION**

**TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on November 13, 2025, at 10:00 a.m., or as soon thereafter counsel may be heard, before the Honorable James Donato in Courtroom 11, on the 19th Floor of the Phillip Burton Federal Building and U.S. Courthouse, 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Dialpad, Inc. ("Dialpad") will and hereby does move to compel this action filed by Plaintiff William Terrill ("Plaintiff") under the California Invasion of Privacy Act ("CIPA") to individual arbitration pursuant to his arbitration agreement with non-party T-Mobile US, Inc. ("T-Mobile") and to stay this action pending resolution of arbitration.

Dialpad moves to compel individual arbitration pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4. Plaintiff entered into a valid and enforceable arbitration agreement with T-Mobile when he opened a T-Mobile account and agreed to its Terms & Conditions. Since first doing so, Plaintiff has repeatedly reaffirmed his assent to that arbitration agreement. That arbitration agreement covers Plaintiff's claims in this action. And that agreement contains a class action waiver that precludes any class action claims. Dialpad is now entitled to enforce Plaintiff's arbitration agreement and class action waiver with T-Mobile under the well-established doctrine of equitable estoppel. Plaintiff's claims should thus be compelled to individual arbitration. And pursuant to Section 3 of the Federal Arbitration Act, 9 U.S.C. § 3, this action should be stayed pending resolution of that individual arbitration. *See Smith v. Spizzirri*, 601 U.S. 472, 478 (2024).

Dialpad's motion to compel individual arbitration is based on this notice of motion, the following memorandum of points and authorities, the supporting declaration of Judy Sanchez ("T-Mobile Decl.") and the exhibits attached thereto, and on all pleadings and papers on file or to be filed in this action, the arguments of counsel, and any other matters properly before this Court.

Dated: September 15, 2025

KEKER, VAN NEST & PETERS LLP

By: */s/ Benjamin Berkowitz*
BENJAMIN BERKOWITZ
CHRISTINA LEE
IAN KANIG
SPENCER MCMANUS
LAUREN S. KANE

Attorneys for Defendant DIALPAD, INC.

## I. INTRODUCTION

Defendant Dialpad, Inc. respectfully moves to compel Plaintiff William Terrill's claims in this action to individual arbitration.[1] Plaintiff alleges that T-Mobile partnered with Dialpad to record, transcribe, and analyze calls to its customer service center. Dkt. No. 1 ("Compl.") ¶¶ 1–8. Even though Plaintiff admits that T-Mobile told him it may record those customer service calls, he alleges that T-Mobile never told him that it may share those audio recordings with a company like Dialpad. *Id.* As a result, Plaintiff claims that Dialpad unlawfully eavesdropped on his March 2025 call to T-Mobile in violation of the California Invasion of Privacy Act. *Id.* ¶¶ 8–12.

In truth, T-Mobile has repeatedly required Plaintiff to affirmatively acknowledge its Terms and Conditions ("Terms") and its incorporated Privacy Notice, which unambiguously disclose that T-Mobile may "share" and "disclose" his "[a]udio, electronic, visual, or similar information" with "[d]ata analytics providers" and "[o]ther service providers" "for a business purpose." *E.g.*, T-Mobile Decl. ¶ 4 & Ex. A at 19–20. That includes Dialpad and the recording, transcription, and analysis services that he speculates it performed for T-Mobile. Indeed, Plaintiff signed a document on February 19, 2025—just weeks before his alleged customer service call—agreeing to T-Mobile's Terms. *Id.* ¶¶ 12–13 & Ex. L. But he elected to file this lawsuit against Dialpad anyway. Compl. ¶¶ 8–12. In doing so, Plaintiff named Dialpad alone, not T-Mobile. *Id.*

The reason why Plaintiff chose to sue Dialpad, and not T-Mobile, is likely because he agreed with T-Mobile to individually arbitrate all claims relating to "[T-Mobile's] Privacy Notice, privacy or data security practices, our services, devices, or products[.]" T-Mobile Decl. ¶¶ 3, 10 & Ex. G at 5–6. In fact, Plaintiff's agreement with T-Mobile requires him to individually arbitrate "any claims against other parties relating to Services, Products, or Devices provided or billed to you," such as "third party vendors," "whenever [he] also assert[s] claims against [T-Mobile] in the same proceeding." *Id.* By filing this lawsuit against Dialpad alone, Plaintiff seemingly believes that he can circumvent his individual arbitration agreement with T-Mobile and assert class action claims in court against Dialpad. Plaintiff is incorrect.

[1] To preserve its rights, Dialpad has also filed a motion to dismiss Plaintiff's complaint in the alternative. This Court need not rule on that motion before the issue of arbitrability is decided.

Dialpad is entitled to enforce Plaintiff's arbitration agreement with T-Mobile under the well-established doctrine of equitable estoppel. Equitable estoppel authorizes a nonsignatory defendant to compel a signatory plaintiff's claims to arbitration: (1) "when the claims against the nonsignatory are intimately founded in and intertwined with the underlying contract"; or (2) "when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct are founded in or intimately connected with the obligations of the underlying agreement." *Herrera v. Cathay Pac. Airways Ltd.*, 104 F. 4th 702, 707 & n.5 (9th Cir. 2024) (cleaned up); *Franklin v. Cmty. Reg'l. Med. Ctr.*, 998 F.3d 867, 871 (9th Cir. 2021). Both circumstances are present here, although just one is sufficient.

***First,*** Plaintiff's claims against Dialpad are "intimately founded in and intertwined with" the privacy rights and obligations set forth in his agreement with T-Mobile. Each of Plaintiff's CIPA claims requires that Plaintiff prove that T-Mobile failed to disclose that it may share his information with third-party vendors. Plaintiff's claims accordingly hinge on the sufficiency of the disclosures in T-Mobile's Terms and Privacy Notice that informed him of the precise practices that he now challenges. *See* Dialpad's Motion to Dismiss at 10–11 (citing *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 955 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th Cir. 2018) (dismissing CIPA claims because the defendant disclosed the challenged practice in its terms and privacy policy)). Thus, as numerous courts in this District have consistently held, this facial intertwinement of a plaintiff's privacy claims with disclosures in an agreement with a non-party signatory warrant equitable estoppel. *E.g.*, *Bender v. Twilio Inc.*, 2025 WL 2308484, at *1–2 (N.D. Cal. Aug. 11, 2025); *Perry-Hudson v. Twilio, Inc.*, 2024 WL 4933332, at *2–3 (N.D. Cal. Dec. 2, 2024); *Hunt v. Meta Platforms, Inc.*, 735 F. Supp. 3d 1133, 1137–38 (N.D. Cal. 2024).

***Second,*** Plaintiff also alleges that T-Mobile and Dialpad acted together to invade his privacy. *E.g.*, Compl. ¶ 3. Because these allegations of unlawful concerted misconduct turn on whether T-Mobile disclosed that it may share his information with its third-party service providers, equitable estoppel is proper on these grounds as well. *E.g.*, *Perry-Hudson*, 2024 WL 4933332, at *2–3.

At bottom, "[t]he 'linchpin' for equitable estoppel is fairness." *Herrera*, 104 F.4th at 710. It is unfair to allow Plaintiff to tactically circumvent his individual arbitration agreement with T-Mobile that challenges T-Mobile's Privacy Notice, its products, and its services by targeting and filing a federal class action against T-Mobile's third-party service provider, Dialpad. Accordingly, Dialpad respectfully requests that the Court compel Plaintiff's claims to individual arbitration and to stay this action pending the completion of the arbitration.

## II. BACKGROUND

### A. Plaintiff has repeatedly agreed to individually arbitrate claims he has against T-Mobile and related third parties since opening an account in June 2016.

In June 2016, Plaintiff created a T-Mobile account at a store in Los Angeles, California. T-Mobile Decl. ¶ 5. In accordance with T-Mobile's standard account-opening procedures in retail stores at the time, T-Mobile made its Terms available in-store for customers to review, and customers were required to accept T-Mobile's Terms before T-Mobile activated their service. *Id.* ¶ 6. Thus, consistent with those procedures, Plaintiff was required to accept—and did accept—the Terms, including its arbitration agreement and class action waiver. *Id.* ¶¶ 6–7 & Ex. B (T-Mobile's Terms, effective March 17, 2016, to which Plaintiff agreed in June 2016).

Since that time, Plaintiff has reaffirmed his agreement to T-Mobile's Terms and its individual arbitration provision during at least ***eight*** subsequent transactions with T-Mobile. *Id.* ¶¶ 8–9, 12–13 & Exs. C–F, I–L. These included his transactions: (a) on June 9, 2020, when he activated two Apple Watch lines of service for use on T-Mobile's network; (b) on September 3, 2020, when he purchased a new iPhone from T-Mobile for use on its network; (c) on May 11, 2021, when he purchased a SIM card and activated a new line of service; (d) on October 19, 2021, when he made an account payment through T-Mobile Customer Care; (e) on July 1, 2023, when he made an in-store payment; (f) on September 13, 2023, when he made another in-store payment; (g) on April 29, 2024, when he purchased device accessories from T-Mobile; and (h) on February 19, 2025, when he purchased SIM cards and activated two new lines of service. *Id.* ¶¶ 9, 13. For each of those transactions, T-Mobile presented to Plaintiff documents—multiple of which he signed with a signature—expressly stating that his use of T-Mobile products and

services is governed by the Terms, including its individual arbitration provision. *E.g.*, *id.* ¶¶ 9, 13 & Ex. C ("**CUSTOMER ACCEPTANCE:** By accepting this form, activating or using T-Mobile service, you agree that . . . Your **'Agreement'** with T-Mobile includes: . . . T-Mobile's 'Terms and Conditions' . . . . **Disputes. T-Mobile requires ARBITRATION OF DISPUTES UNLESS YOU OPT-OUT WITHIN 30 DAYS OF ACTIVATION.** For details see www.T-Mobile.com/terms-conditions."), Exs. D–F, I–L ("If you activate or use T-Mobile service, or purchase a T-Mobile device, you agree to T-Mobile's Terms and Conditions and any terms specific to your rate plan. . . . **Disputes.** T-Mobile REQUIRES ARBITRATION OF DISPUTES unless for new customers YOU OPT OUT WITHIN 30 DAYS OF ACTIVATION, or for existing customers YOU PREVIOUSLY OPTED OUT PURSUANT TO T-MOBILE'S TERMS AND CONDITIONS. For details see T-Mobile's Terms and Conditions at www.T-Mobile.com/terms-conditions.").

T-Mobile has further notified Plaintiff of changes to the Terms and that his continued use of T-Mobile products and services qualifies as assent to any updated provisions. For instance, T-Mobile revised its Terms on May 15, 2023, which was the first update since Plaintiff originally agreed to them in June 2016. *Id.* ¶ 10 & Ex. G ("2023 Terms"). Before the 2023 Terms took effect, T-Mobile emailed its customers to explain the upcoming changes in the revised Terms. *Id.* ¶ 11 & Ex. H. T-Mobile's business records reflect that in April 2023, T-Mobile sent to Plaintiff an email entitled "We're updating our terms and conditions" and informing him that "[b]y using your service after [May 15, 2023], you'll agree to the updated Terms and Conditions." *Id.* ¶ 11 & Ex. H. This notice was followed by Plaintiff's transactions with T-Mobile on several occasions, including on April 29, 2024, and February 19, 2025, during which time he again agreed to the revised 2023 Terms. *Id.* ¶ 13 & Exs. K–L.

Plaintiff alleges that he called T-Mobile's customer service line in or around March of 2025. Compl. ¶ 9. Based on his speculation that Dialpad recorded, transcribed, and analyzed that phone call, Plaintiff filed this class action lawsuit against Dialpad on May 28, 2025. At the time of his call and filing this lawsuit, T-Mobile's 2023 Terms were in effect. T-Mobile Decl. ¶ 10 & Ex. G. At that time, Plaintiff had repeatedly and affirmatively assented to the 2023 Terms. *Id.*,

Exs. I–L.[2]

**B. T-Mobile's individual arbitration agreement covers any claims related to its incorporated Privacy Notice, privacy practices, services, devices, or products.**

At the top of T-Mobile's Terms, T-Mobile alerted Plaintiff about the individual arbitration clause that is set out below: "These Terms & Conditions ("T&Cs") contain important information about your relationship with us, including individual mandatory binding arbitration of disputes between us, instead of class actions or jury trials. By Accepting these T&Cs, you agree, on behalf of yourself, any person on your account, an Authorized User, and any person you allow to use the Services, Product, or your Device, to be bound by these provisions." *Id.*, Ex. G at 2.

T-Mobile again alerted Plaintiff about its individual arbitration clause in a section on the second page entitled, "**WHAT IS INCLUDED IN THESE TERMS AND CONDITIONS?**" *Id.* at 3. T-Mobile explained: "In these T&Cs, you'll find important information about: • Our services provided to you (**'Service'**); • Any equipment for which we provide Service or which we provide to you to be used with our Service, like a phone, handset, tablet, SIM card, or accessory (collectively, a **'Device'**); • Any feature, product, or solution that we provide to you, (collectively, a **'Product'** or **'Feature'**); • Any charges, taxes, fees, and other amounts we charge you or that were accepted or processed through your Device ('Charges'); . . . and • **Resolution of disputes by individual arbitration and class action and jury trial waivers**")." *Id.* (emphases added).

In the "**DISPUTE RESOLUTION**" section, T-Mobile sets out its arbitration provision: "***Individualized Dispute Resolution and Arbitration.*** **YOU AND WE EACH AGREE THAT, EXCEPT AS PROVIDED BELOW, ANY AND ALL CLAIMS OR DISPUTES, OF ANY NATURE, INCLUDING TORT AND STATUTORY CLAIMS, IN ANY WAY RELATED TO OR CONCERNING THE AGREEMENT, OUR PRIVACY NOTICE, PRIVACY OR DATA SECURITY PRACTICES, OUR SERVICES, DEVICES OR PRODUCTS . . . WILL BE RESOLVED BY INDIVIDUAL BINDING ARBITRATION OR IN SMALL CLAIMS COURT.** This includes any claims against other parties relating to Services, Products, or Devices

[2] T-Mobile has since revised its Terms one more time, on August 1, 2025. T-Mobile Decl. ¶ 14 & Ex. M ("2025 Terms"). There is no material difference between the arbitration provisions in the 2023 Terms and the 2025 Terms that impact this motion to compel individual arbitration.

provided or billed to you (such as our suppliers, dealers, authorized retailers, or third-party vendors) whenever you also assert claims against us in the same proceeding." *Id.* at 5–6 (emphasis in original).[3] This section then sets out a class action waiver: "**Class and Mass Action Waiver. YOU AND WE EACH AGREE THAT ANY PROCEEDINGS, WHETHER IN ARBITRATION OR COURT, WILL BE CONDUCTED ONLY ON AN INDIVIDUAL BASIS AND NOT AS A CLASS, REPRESENTATIVE, MASS, OR CONSOLIDATED ACTION.**" *Id.* at 7 (emphasis in original).

Since Plaintiff opened his account in June 2016, T-Mobile's Terms have permitted its customers to opt out of individual arbitration within 30 days from the earlier of (1) the date of purchase of a product or device or (2) the date a new line of service was activated. *See, e.g.*, *id.*, Ex. B at 8, Ex. G at 6. T-Mobile has no record of Plaintiff opting out (or trying to opt out) of arbitration. *Id.* ¶ 16.

In sum, Plaintiff has repeatedly agreed to T-Mobile's individual arbitration agreement.

### C. T-Mobile's Privacy Notice discloses that T-Mobile may share customer service calls with third-party service providers for any business purpose.

The 2023 Terms operative at the time of Plaintiff's alleged customer service call (and the prior version of the Terms that Plaintiff agreed to when he opened his T-Mobile account in 2016) expressly incorporate and hyperlink to T-Mobile's Privacy Notice. *Id.* ¶ 4 & Ex. B at 2, Ex. G at 2. The T-Mobile Privacy Notice that was in effect at the time of Plaintiff's alleged customer service call—that he acknowledged and assented to during his last T-Mobile transaction on February 19, 2025—is the September 20, 2024 version. *Id.* ¶ 4 & Ex. A ("September 2024 Privacy Notice").

On its first page, T-Mobile's 2023 Terms alerted Plaintiff that he was also agreeing to T-Mobile's incorporated and hyperlinked Privacy Notice: "Accepting these T&Cs means you also agree to our Privacy Notice, located at www.T-Mobile.com/privacy, which may be updated from

---

[3] Pursuant to T-Mobile's dispute resolution provision, Plaintiff also has the alternative right, to the extent permitted by law, to file a claim in small claims court. T-Mobile Decl., Ex. G at 6. Plaintiff's alleged damages would disqualify this action from small claims court, so the only form of dispute resolution available to Plaintiff here is binding individual arbitration.

time to time. Our Privacy Notice describes the information we collect, how that information may be used and shared, and the choices you have about certain uses of information." *Id.*, Ex. G at 2.

Just beneath that, in a section entitled "**ARE THERE ANY OTHER TERMS THAT APPLY TO ME?**," T-Mobile again alerted Plaintiff that he was agreeing to its Privacy Notice. *Id.* at 3. That section states: "You should be aware that our Privacy Notice, located at www.T-Mobile.com/privacy, and Open Internet Policy, located at www.T-Mobile.com/OpenInternet, apply to the use of our Devices, Products and Services. We also provide a Privacy Dashboard that includes tools for you to manage your privacy choices and learn more about what data we collect about you. Visit https://www.t-mobile.com/privacy-center/dashboard for more information." *Id.*

Plaintiff agreed to T-Mobile's September 2024 Privacy Notice, which "describes the personal data we collect, how it's used, shared, and protected, as well as the data choices available to you." *Id.* ¶ 4 & Ex. A at 2. The Privacy Notice explains, among other things, that T-Mobile "may record telephone calls with customer service or sales representatives." *Id.*, Ex. A at 4. Additionally, in the "How we share data" section of the Privacy Notice, T-Mobile further disclosed that it would "share" and "disclose" customers' "[a]udio, electronic, visual, or similar information" with third-party "[d]ata analytics providers" and "[o]ther service providers" "for a business purpose." *Id.* at 16, 19–20.

### D. Plaintiff now alleges that T-Mobile secretly partnered with Dialpad to analyze his customer service call, but asserts privacy claims against Dialpad alone.

Plaintiff alleges that T-Mobile "partners with" Dialpad to record, transcribe, and analyze customer service calls to T-Mobile. Compl. ¶¶ 1–3. Even though Plaintiff admits that T-Mobile told him it may record those customer service calls, he alleges that "[u]nbeknownst to consumers, when they contact and speak with businesses such as T-Mobile, Dialpad eavesdrops and records these conversations to which it is not a party." *Id.* ¶ 4. According to Plaintiff, T-Mobile and Dialpad are secretly acting in concert to do so: "T-Mobile has aided, agreed with, employed, and/or permitted Dialpad to monitor, read, record, learn the contents of, or otherwise intercept the conversations of their current and prospective consumers without their consent." *Id.* ¶ 3. Plaintiff claims that "neither T-Mobile nor Dialpad procured the consent of any person who interacted

with T-Mobile prior to Dialpad recording, accessing, reading, and learning the contents of conversations between Californian residents and T-Mobile." *Id.* ¶ 6; *see also id.* ¶¶ 10–11. He alleges that "there is no disclosure that consumers' calls will also be shared with Dialpad, an unknown third party, for purposes unrelated to quality assurance and/or training." *Id.* ¶ 7.

Because Plaintiff speculates that his alleged customer service call with T-Mobile was recorded, transcribed, and analyzed by Dialpad, he asserts putative class action privacy claims against Dialpad under Sections 631 and 632 of the CIPA. *Id.* ¶¶ 48–60 (Section 631 wiretapping and interception claims); *id.* ¶¶ 61–69 (Section 632 eavesdropping claim). For those claims, Plaintiff seeks damages, declaratory and injunctive relief, and his attorneys' fees and costs. *Id.* at 14.

## III. ARGUMENT

### A. Plaintiff's privacy claims against Dialpad fall squarely within the scope of the valid individual arbitration agreement that he entered into with T-Mobile.

The Federal Arbitration Act ("FAA") governs arbitrability given that T-Mobile's Terms involve interstate commerce and expressly provide for application of the FAA. *S.S. by & through Stern v. Peloton Interactive, Inc.*, 566 F. Supp. 3d 1019, 1042 (S.D. Cal. 2021); *Williams v. Eaze Sols., Inc.*, 417 F. Supp. 3d 1233, 1238 (N.D. Cal. 2019); *see also* T-Mobile Decl., Ex. G at 6, 8.

Congress enacted the FAA to reverse the "widespread judicial hostility to arbitration agreements." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *see also* 9 U.S.C. § 1, *et seq.* The FAA "reflects an emphatic federal policy in favor of arbitral dispute resolution." *Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 533 (2012). The FAA "mandates that . . . courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). In determining whether to compel a party to arbitrate, the court must thus determine: "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013) (internal marks and citation omitted). Both of those questions are answered in the affirmative here.

***First,*** applying the FAA, district courts in the Ninth Circuit have routinely held that T-

Mobile's arbitration agreement is valid and enforceable. *E.g.*, *Clements v. T-Mobile USA, Inc.*, 712 F. Supp. 3d 1290, 1298 (N.D. Cal. 2024), *reconsideration denied sub nom. Clements v. T-Mobile USA, Inc*, 2024 WL 2060866 (N.D. Cal. May 8, 2024); *Juarez v. T-Mobile USA Inc.*, 2024 WL 5424366, at *4 (C.D. Cal. Aug. 23, 2024); *Rodriguez v. T-Mobile USA, Inc.*, 2023 WL 6593786, at *2 (S.D. Cal. Sept. 28, 2023); *Dominguez v. T-Mobile USA, Inc.*, 2017 WL 8220598, at *4 (C.D. Cal. Jan. 18, 2017). These cases enforce the exact same Terms that are at issue here, and the evidence shows that Plaintiff repeatedly and conspicuously consented to arbitration.

***Second***, there is no real question that Plaintiff's claims fall within the scope of T-Mobile's arbitration provision. T-Mobile's arbitration provision covers "**ANY AND ALL CLAIMS OR DISPUTES, OF ANY NATURE, INCLUDING TORT AND STATUTORY CLAIMS, IN ANY WAY RELATED TO OR CONCERNING THE AGREEMENT, OUR PRIVACY NOTICE, PRIVACY OR DATA SECURITY PRACTICES, OUR SERVICES, [AND] DEVICES OR PRODUCTS.**" T-Mobile Decl., Ex. G at 5 (emphasis in original). Plaintiff's privacy claims directly implicate T-Mobile's "Privacy Notice" and "privacy or data security practices," and courts have held that privacy claims "fall squarely within the scope of the Arbitration Agreement." *See id.*; Compl. ¶¶ 3, 6, 11; *see also, e.g.*, *Clements*, 712 F. Supp. 3d at 1299 (granting T-Mobile's motion to compel arbitration of privacy claims under the exact same 2023 Terms at issue here). Even if there were ambiguity, the FAA requires that "an ambiguity [] must be construed in favor of arbitration." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

Accordingly, this Court should conclude that there is a valid and enforceable arbitration agreement between Plaintiff and T-Mobile that covers the privacy claims he asserts in this case.

### B. Dialpad is entitled to enforce Plaintiff's arbitration agreement with T-Mobile as a nonsignatory under California's doctrine of equitable estoppel.

The final step in the analysis concerns whether Dialpad may invoke Plaintiff's arbitration agreement. "[A] litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement." *Herrera*, 104 F.4th at 707 (citations omitted). California supplies the relevant state contract law

here. *See* T-Mobile Decl. ¶ 5 & Ex. G at 8 (providing that the Terms are governed by "the laws of the state or jurisdiction in which your billing address in our records is located"); *see also* Compl. ¶¶ 9–12 (alleging that Plaintiff resides in California). California's doctrine of equitable estoppel permits a nonsignatory defendant to compel arbitration of a signatory plaintiff's claims when (1) "the claims against the nonsignatory are intimately founded in and intertwined with the underlying contract;" ***or*** (2) "the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct are founded in or intimately connected with the obligations of the underlying agreement." *Herrera*, 104 F.4th at 707 & n.5 (cleaned up). Here, both circumstances are present. Because Plaintiff's arbitration agreement with T-Mobile is intended to require arbitration of "any claims against other parties relating to Services, Products, or Devices provided or billed to you," "such as . . . third-party vendors," equitable estoppel is particularly warranted in this case to prevent his unfair tactics. T-Mobile Decl., Ex. G at 6.

### 1. Plaintiff's claims are intertwined with his contract with T-Mobile because they require interpretation of T-Mobile's Privacy Notice.

The first circumstance where equitable estoppel applies is when a signatory plaintiff's claims against a nonsignatory are "intimately founded in and intertwined with" the rights and obligations outlined in the agreement containing the arbitration clause. *Herrera*, 104 F.4th at 707. In determining whether a signatory plaintiff's claims are founded in and intertwined with the agreement containing the arbitration clause, courts consider "the relationships of persons, wrongs and issues," regardless of whether the plaintiff specifically references the underlying contract that contains the arbitration agreement. *Franklin*, 998 F.3d at 871. "California law does not require that every allegation in the complaint be intertwined with the contract containing the arbitration clause for equitable estoppel to apply." *Herrera*, 104 F.4th at 710. Rather, Dialpad need only show that this Court would have to interpret the terms and disclosures set forth in T-Mobile's Terms and Privacy Notice to resolve the dispute between Plaintiff and Dialpad. *See id.* at 709–10; *Franklin*, 998 F.3d at 871; *In re Pac. Fertility Ctr. Litig.*, 814 F. App'x 206, 209 (9th Cir. 2020); *Bender*, 2025 WL 2308484, at *1; *Perry-Hudson*, 2024 WL 4933332, at *2–3; *Hunt*,

735 F. Supp. 3d at 1137–38. Put simply, "[t]he question is whether [Plaintiff's] claims are 'fully viable without reference to' the underlying agreement." *Perry-Hudson*, 2024 WL 4933332, at *2.

Here, equitable estoppel applies because Plaintiff's claims are founded in and intimately intertwined with his contract with T-Mobile. His privacy claims require him to prove T-Mobile did not disclose that it may share his information with third parties like Dialpad. For his Section 631 claim, Plaintiff must prove that Dialpad made an "***unauthorized*** connection" with a "telegraph or telephone wire" or attempted to read or learn the contents of a communication "***without the consent*** of all parties." Cal. Penal Code § 631(a) (emphasis added). For his Section 632 claim, Plaintiff must prove that Dialpad used an "electronic amplifying or recording device" to "eavesdrop" on the communication "***without the consent*** of all parties." Cal. Penal Code § 632 (emphasis added). Thus, "[e]ach claim requires [Plaintiff] to plead (and ultimately prove) that [he] did not consent to [Dialpad's] interception." *Perry-Hudson*, 2024 WL 4933332, at *2 (Section 631 and 632 claims); *see also Smith*, 262 F. Supp. 3d at 955 (Section 631); *Bender*, 2025 WL 2308484, at *6 (same); *Flanagan v. Flanagan*, 27 Cal. 4th 766, 776–77 (2002) (Section 632); *Thomasson v. GC Servs. Ltd. P'ship*, 321 F. App'x 557, 559 (9th Cir. 2008) (same); *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1073 (N.D. Cal. 2021) (same). Indeed, even Plaintiff recognizes that he must plead and prove these statutory elements, given that he implausibly alleges he did not know, consent, or authorize T-Mobile to share his information with Dialpad, notwithstanding T-Mobile's disclosures. Compl. ¶¶ 3, 6, 11 (generally), ¶ 58 (Section 631), ¶ 68 (Section 632).

Accordingly, Plaintiff's claims cannot be evaluated without interpreting the agreement between T-Mobile and Plaintiff, which expressly includes T-Mobile's Privacy Notice. T-Mobile Decl. ¶ 2. The Privacy Notice sets forth what data T-Mobile may collect from users, what tools it may use to collect it, with whom it may share the data, and for what purposes the data may be used. *Id.*, Ex. A at 4, 16, 19–20 (disclosing that T-Mobile shares "audio" information to "[d]ata analytics providers" and "[o]ther service providers" "for a business purpose."). Because the absence of consent is a statutory element of each claim, the Privacy Notice's disclosure of what information T-Mobile can collect from Plaintiff, with whom it may share the information, and for

what purpose "is [] critical to the issue of consent." *Bender*, 2025 WL 2308484, at *6; *Perry-Hudson*, 2024 WL 4933332, at *2. Because the viability of Plaintiff's claims cannot be determined without reference to the agreement, Plaintiff's claims are intertwined with his contract with T-Mobile and should be compelled to arbitration. *See Perry-Hudson*, 2024 WL 4933332, at *2.

Courts in this District regularly apply equitable estoppel under similar circumstances. In *Bender v. Twilio*, the district court granted Twilio's motion to compel arbitration pursuant to an agreement between the plaintiff and Calm, the creator of the mobile application the plaintiff used, which included a Twilio software development kit ("SDK"). 2025 WL 2308484, at *1. The plaintiff alleged that Twilio's SDK violated his privacy by collecting consumer information (such as keystrokes and page views) from his Calm app without his consent. *Id.* at *1–2. In determining whether the plaintiff's claims against Twilio are "intimately founded in and intertwined with" the Calm Terms of Service, the court first considered whether the plaintiff's claims (including a Section 631 CIPA claim) require the defendant's access and use of his data was unauthorized. *Id.* at *5. Put simply, "whether [the plaintiff] consented to transfer of his information from the Calm app to Twilio is an essential element of his claims." *Id.* at *6. Given that Calm's Privacy Policy discloses the transfer of user information to third parties like Twilio, the court found Calm's Privacy Policy "critical to the issue of consent"—in other words, "it cannot be said [Bender's] 'claims are fully viable without reference to' the policy." *Id.* (citing *Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209, 230 (2009)). Accordingly, although Twilio was not a signatory to the agreement, the court easily determined that Twilio may enforce the agreement to arbitrate between Bender and Calm. *Id.* at *8.

The court in *Perry-Hudson* also found intertwinement under similar circumstances involving the same claims Plaintiff asserts here. There, although the plaintiff sued Twilio only, third-party Keeps's Privacy Policy, which was "incorporated into the Keeps Terms," addressed "how Keeps 'collects, uses, and shares' information about its users" and disclosed that Keeps "provides information to third-party vendors." *Id.* at *2. "So," the court reasoned, "even though [the plaintiff] brings suit only against Twilio, his claims are . . . intertwined with his agreement

with Keeps because consent is an element to each claim, and Twilio asserts that [the plaintiff] consented to having Keeps share his data to Twilio through his agreement to the Terms." *Id.*

Similarly, in *Hunt*, the court granted Meta's and Google's motions to compel individual arbitration for the same reasons. *See* 735 F. Supp. 3d at 1138. The plaintiff in that case alleged that H&R Block had violated privacy laws by providing his tax return information to defendants Google and Meta through tracking tools installed on H&R Block's website. *Id.* at 1135–36. To use H&R Block's tax services, the plaintiff had entered into an online services agreement, which contained an arbitration clause. *Id.* at 1136. Meta and Google moved to enforce the plaintiff's arbitration agreement with H&R Block, arguing that his claims were founded in and intertwined with the disclosures in the H&R Block Privacy Policy. *Id.* at 1137. The court found that, because the plaintiff's claims required proving that H&R Block's privacy policy did not disclose that H&R Block would share the plaintiff's personal information with third parties like Meta and Google, the claims were "closely intertwined" with the plaintiff's agreement with H&R Block. *Id.* at 1137–38; *see also Uptown Drug Co., Inc. v. CVS Caremark Corp.*, 962 F. Supp. 2d 1172, 1184–86 (N.D. Cal. 2013) (similar); *Breathe Techs., Inc. v. New Aera, Inc.*, 2020 WL 4747896, at *5–6 (N.D. Cal. Aug. 17, 2020) (similar).

In sum, just as in *Bender*, *Perry-Hudson*, and *Hunt*, Plaintiff's claims are intertwined with his agreement and Privacy Notice. Plaintiff's claims should be compelled to individual arbitration.

**2. Plaintiff's allegations that T-Mobile and Dialpad acted in concert to invade his privacy are also intertwined with T-Mobile's disclosures.**

The second circumstance allowing equitable estoppel—concerted activity between a nonsignatory defendant and a signatory non-party—applies as well. Equitable estoppel applies in this circumstance where a plaintiff alleges that a signatory and non-signatory have acted "jointly in furtherance of a common scheme," and the legality of that scheme cannot be resolved without looking to the terms of the plaintiff's contract. *See Sanders v. Swift Transp. Co. of Ariz., LLC*, 843 F. Supp. 2d 1033, 1038 (N.D. Cal. 2012) (compelling arbitration on this basis). Where the signatory is the "principal wrongdoer," in that it initiated and organized the common scheme with

the non-signatory, estoppel is particularly appropriate. *See Carter v. Spiegel*, 2022 WL 126303, at *6 (N.D. Cal. Jan. 13, 2022) (compelling arbitration on this basis).

Here, the core theory of Plaintiff's case is that T-Mobile colluded with Dialpad to secretly collect and use T-Mobile users' information for their mutual profit. Compl. ¶ 3 ("By employing [Dialpad's] Services, T-Mobile has aided, agreed with, employed, and/or permitted Dialpad to monitor, read, record, learn the contents of, or otherwise intercept the conversations of their current and prospective consumers without their consent"); *id.* ¶ 5 ("Dialpad needs access to this data to provide the Services' features"); *id.* ¶ 6 ("Crucially, neither T-Mobile nor Dialpad procured the consent of any person who interacted with T-Mobile prior to Dialpad recording, accessing, reading, and learning the contents of conversations between Californian residents and T-Mobile."). Thus, Plaintiff expressly alleges that T-Mobile and Dialpad acted "jointly in furtherance of a common scheme" to exploit his data. *See Sanders*, 843 F. Supp. 2d at 1038.

Moreover, by Plaintiff's own allegations, Dialpad is not and cannot be the "principal wrongdoer" described in this case. *See Carter*, 2022 WL 126303, at *6. Plaintiff's allegations at most show that Dialpad is merely a third-party service provider that provides its customers with a lawful set of technical tools that its customers choose to configure and deploy. Compl. ¶¶ 24–29. Such conduct falls well short of any "principal wrongdo[ing]." *Carter*, 2022 WL 126303, at *6.

Given that Plaintiff's allegations of coordinated misconduct between T-Mobile and Dialpad hinge on whether T-Mobile properly disclosed that it may share customer information with third-party vendors, evaluation of Plaintiff's claims requires interpretation of the T-Mobile Terms. Courts hold that similar allegations of concerted activity warrant equitable estoppel.

In *Perry-Hudson*, the plaintiff alleged that he provided his health data to Keeps, believing it would be used only to obtain a prescription recommendation. 2024 WL 4933332, at *3. But he claims that Keeps disclosed users' personal health data to Twilio through the tracking tool Keeps embedded in its product. *Id.* The court easily concluded that these allegations amounted to "interdependent and concerted misconduct" between Keeps and Twilio and that, because the language in Keeps's Privacy Policy addressed its obligations regarding the plaintiff's data and his consent to share that data with others, the plaintiff's allegations of "interdependent and concerted

misconduct" were "intimately connected with the obligations of the underlying agreement." *Id.*

Likewise, in *Salas v. Universal Credit Servs., LLC*, the plaintiff enrolled in a debt settlement program with defendant Priority, pursuant to a contract with an arbitration provision. 2019 WL 1242448, at *1 (S.D. Cal. Mar. 18, 2019). Even though that contract "authorized" Priority to share the plaintiff's credit report with third parties to perform its services, the plaintiff sued Priority and other third parties under credit reporting statutes. *Id.* at *4. The nonsignatories moved to compel arbitration, and the court granted their motion. *Id.* at *5. The court found that the allegations of "interdependent conduct" regarding the defendants' sharing of his credit report were "intimately connected to the obligations" set out in his contract because it addressed whether they could do so. *Id.* at *4. Further, it was "clear that all of the [d]efendants will rely on the [contract's disclosure] as a defense for their actions." *Id.*; *see also Hunt*, 735 F. Supp. 3d at 1138 (similar); *Coinmint, LLC v. DX Corr Design, Inc.*, 2023 WL 9595893, at *1, *3–4 (N.D. Cal. Apr. 24, 2023) (similar).

Plaintiff's allegations of concerted misconduct between T-Mobile and Dialpad warrant the same application of equitable estoppel. His claims should thus be compelled to arbitration.

### C. This Court should stay Plaintiff's action pending resolution of arbitration.

Under Section 3 of the FAA, when a district court determines that a lawsuit involves an arbitrable dispute and a party requests a stay pending arbitration, the court must grant the stay. *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024); *see also Theodore v. Am. Express Nat'l Bank*, 2024 WL 4165274, at *3 (N.D. Cal. Aug. 27, 2024), *appeal dismissed*, 2024 WL 4723319 (9th Cir. Sep. 24, 2024). Thus, if the Court determines that Plaintiff's claims are arbitrable, it must also stay the case pending resolution of individual arbitration.

## IV. CONCLUSION

For the foregoing reasons, Dialpad respectfully requests that the Court grant its motion to compel individual arbitration and stay this case pending resolution of that individual arbitration.

///

///

///

Dated: September 15, 2025

KEKER, VAN NEST & PETERS LLP

By: */s/ Benjamin Berkowitz*
BENJAMIN BERKOWITZ
CHRISTINA LEE
IAN KANIG
SPENCER MCMANUS
LAUREN S. KANE

Attorneys for Defendant DIALPAD, INC.